## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **MARY WARD** | § | |
| | § | |
| | § | |
| v. | § | |
| | § | **CASE NO. 6:21-cv-00019-KNM** |
| | § | |
| **COMMISSIONER, SOCIAL** | § | |
| **SECURITY ADMINISTRATION** | § | |
| | § | |

## <u>MEMORANDUM OPINON AND ORDER</u>

Plaintiff initiated this lawsuit by filing a complaint seeking judicial review of the Commissioner's decision denying her application for Social Security benefits. This matter is referred to the undersigned for findings of fact, conclusions of law and recommendations for the disposition of the matter pursuant to 28 U.S.C. § 636(b)(1). For the reasons below, the Commissioner's final decision is **AFFIRMED** and the above-styled lawsuit is **DISMISSED WITH PREJUDICE**.

## PROCEDURAL HISTORY

On March 28, 2018, Plaintiff Mary Ward, filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income, alleging a disability onset date of December 30, 2014. The applications were initially denied on July 18, 2018, and again upon reconsideration on January 9, 2019. Plaintiff filed a written request for a hearing before an Administrative Law Judge ("ALJ"). The ALJ conducted a video hearing on May 21, 2020, and issued an unfavorable decision on June 4, 2020, concluding that Plaintiff was not disabled under 216(i) and 223(d) or Section 1614(a)(3)(A) of the Social Security Act ("the Act"). Plaintiff submitted a request for review of the ALJ's decision. On

November 17, 2021, the Appeals Council denied the request for review, and as a result, the ALJ's decision became that of the Commissioner. Plaintiff filed this lawsuit on January 15, 2021, seeking judicial review of the Commissioner's decision.

## LEGAL STANDARD

Title II of the Act provides for federal disability insurance benefits. Title XVI of the Act provides for supplemental security income for the disabled. The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1983); *Rivers v. Schweiker*, 684 F.2d 11144, 1146, n. 2 (5th Cir. 1982); *Strickland v. Harris*, 615 F.2d 1103, 1105 (5th Cir. 1980).

Judicial review of the denial of disability benefits under section 205(g) of the Act, 42 U.S.C. § 405(g), is limited to "determining whether the decision is supported by substantial evidence in the record and whether the proper legal standards were used in evaluating the evidence." *Bowling v. Shala*, 36 F.3d 431, 435 (5th Cir. 1994) (quoting *Villa v. Sullivan*, 895 F.2d 1019,1021 (5th Cir. 1990)); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) (per curiam). A finding of no substantial evidence is appropriate only where there is a conspicuous absence of credible choices or no contrary medical evidence. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). Accordingly, the Court "may not reweigh the evidence in the record, nor try to the issues *de novo*, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision." *Bowling*, 36 F.3d at 435 (quoting *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988)); *see Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993); *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992); *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Rather,

conflicts in the evidence are for the Commissioner to decide. *Spellman*, 1 F.3d at 360 (citing *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990)); *Anthony*, 954 F.2d at 295 (citing *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983)). A decision on the ultimate issue of whether a claimant is disabled, as defined in the Act, rests with the Commissioner. *Newton v. Apfel*, 209 F.3d 448, 455-56 (5th Cir. 2000); Social Security Ruling ("SSR") 96-5p.

"Substantial evidence is more than a scintilla but less than a preponderance—that is, enough that a reasonable mind would judge it sufficient to support the decision." *Pena v. Astrue*, 271 Fed. Appx. 382, 383 (5th Cir. 2003) (citing *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994)). Substantial evidence includes four factors: (1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability; and (4) the Plaintiff's age, education, and work history. *Fraga v. Bowen*, 810 F.2d 1296, 1306 n. 4 (5th Cir. 1987). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). However, the Court must do more than "rubber stamp" the Administrative Law Judge's decision; the Court must "scrutinize the record and take into account whatever fairly detracts from the substantiality of evidence supporting the [Commissioner's] findings." *Cook*, 750 F.2d at 393 (5th Cir. 1985). The Court may remand for additional evidence if substantial evidence is lacking or "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994).

A claimant for disability has the burden of proving a disability. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

3

be expected to result in death, or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1)(A) and 423(d)(1)(A). A "physical or mental impairment" is an anatomical, physiological, or psychological abnormality which is demonstrable by acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

In order to determine whether a claimant is disabled, the Commissioner must utilize a five–step sequential process. *Villa*, 895 F.2d 1022. A finding of "disabled" or "not disabled" at any step of the sequential process ends the inquiry. *Id.*; *see Bowling*, 36 F.3d at 435 (citing *Harrell*, 862 F.2d at 475). Under the five–step sequential analysis, the Commissioner must determine at Step One whether the claimant is currently engaged in substantial gainful activity. At Step Two, the Commissioner must determine whether one or more of the claimant's impairments are severe. At Step Three, the Commissioner must determine whether the claimant has an impairment or combination of impairments that meet or equal one of the listings in Appendix I. Prior to moving to Step Four, the Commissioner must determine the claimant's Residual Functional Capacity ("RFC"), or the most that the claimant can do given her impairments, both severe and non-severe. Then, at Step Four, the Commissioner must determine whether the claimant is capable of performing her past relevant work. Finally, at Step Five, the Commissioner must determine whether the claimant can perform other work available in the local or national economy. 20 C.F.R. §§ 404.1520(b)–(f).

An affirmative answer at Step One or a negative answer at Steps Two, Four, or Five results in a finding of "not disabled." *See Villa*, 895 F.2d at 1022. However, an affirmative answer at Steps Three, Four, or Five, creates a presumption of disability. *Id.* To obtain Title II disability benefits, a plaintiff must show that he was disabled on or before the last day of her insured status. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981), *cert denied*, 455 U.S. 912, 102 S.Ct. 1263, 71

L.Ed.2d 452 (1982). The burden of proof is on the claimant for the first four steps but shifts to the Commissioner at Step Five if the claimant shows that she cannot perform her past relevant work. *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989) (per curiam).

The procedure for evaluating a mental impairment is set forth in 20 C.F.R. §§ 404.1520a and 416.920a (the "special technique" for assessing mental impairments, supplementing the five–step sequential analysis). First, the ALJ must determine the presence or absence of certain medical findings relevant to the ability to work. 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). Second, when the claimant establishes these medical findings, the ALJ must rate the degree of functional loss resulting from the impairment by considering four areas of function: (a) activities of daily living; (b) social functioning; (c) concentration, persistence, or pace; and (d) episodes of decompression. 20 C.F.R. §§ 404.1520a(c) (2-4), 416.920a(c) (2-4). Third, after rating the degree of loss, the ALJ must determine whether the claimant has a severe mental impairment. 20 C.F.R. §§ 404.1520a(d), 416.920a(d). If the ALJ's assessment is "none" or "mild" in the first three areas of function, and is "none" in the fourth area of function, the claimant's mental impairment is "not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, when a mental impairment is found to be severe, the ALJ must determine if it meets or equals a Listing. 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if a Listing is not met, the ALJ must then perform a residual functional capacity assessment, and the ALJ's decision "must incorporate the pertinent findings and conclusions" regarding the claimant's mental impairment, including "a specific finding as to the degree of limitation in each of the functional areas described in [§§ 404.1520a(c)(3), 416.920a(c)(3)]." 20 C.F.R. §§ 404.1520a(d)(3) and (e)(2), 416.920a(d)(3) and (e)(2).

## ALJ'S FINDINGS

The ALJ made the following findings in the April 15, 2016, decision:

1. The claimant meets the insured status requirement and of the Social Security Act through September 30, 2019.

2. The claimant has not engaged in substantial gainful activity since October 9, 2015, the amended alleged onset date (20 C.F.R. 404.1571 *et seq.* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: type-two diabetes mellitus with neuropathy and retinopathy, degenerative disc disease, fibromyalgia, obesity, major depressive disorder, and generalized anxiety disorder (20 C.F.R. 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5. After careful consideration of the entire record, the undersigned found that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). That is, she can lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday. However, while she can frequently balance, she can only occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, or scaffolds. She should avoid hazards such as dangerous moving machinery or unprotected heights. From a mental standpoint, the claimant can understand, remember, and carry out detailed but not complex tasks and instructions. She can interact without limitation with co-workers and supervisors, but she can have only occasional interaction with the general public. Finally, she can adapt to changes and respond to customary work pressure in a routine environment.

6. The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7. The claimant was born on October 9, 1965, and was 50 years old, which is defined as an individual closely approaching advanced age, on the amended alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 9, 2015, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

## ADMINISTRATIVE RECORD

*Administrative Hearing*

Plaintiff testified before the ALJ on May 21, 2020. Plaintiff initially alleged a disability onset date of December 30, 2014. During the hearing, Plaintiff amended the disability onset date to October 9, 2015. Plaintiff testified that she is 54 years of age, is five foot and three inches tall, weighs 240 pounds, and is right-handed. Plaintiff stated that she previously worked as a part-time home health provider and that her duties included bathing patients, cleaning, washing, and vacuuming. Plaintiff testified that the most challenging part of her job was turning, lifting, bathing, and dressing the patients. Plaintiff stated she quit her job in 2014 because she could no longer perform the tasks.

Plaintiff explained that she has trouble driving because of her poor eyesight, and that her husband and son do most of the driving for her. Plaintiff stated that she has trouble reading unless the words are in big print. Additionally, Plaintiff testified that her "eyes glow and go blurry" and that she cannot see to her side.[1] Plaintiff stated that she wears glasses, which provide a little help. Plaintiff testified that her entire body has been in constant pain for years. Plaintiff stated that minimal movement makes the pain worse, and the only thing that makes her pain better is lying

---

[1] Administrative Record, Oral Hearing Transcript at *26 (Bates stamp p. 688).

down. Plaintiff explained that she has trouble walking and always uses a cane. Plaintiff stated that she stays in bed most of the day. Plaintiff testified that she can stand for fifteen minutes at a time and sit for ten minutes at a time, and that she can lift eight and a half pounds and carry that weight a short distance.

Plaintiff stated that she takes medications to try and get relief from the pain, but that the medicines do not help much. Plaintiff testified that her medications cause suicidal thoughts and drowsiness, and as a result, she is unable to think straight or function properly. Plaintiff testified that she had tried aquatic water aerobics and received injections for pain, but neither provided any relief. Plaintiff testified that she has type two diabetes with high blood sugar, which causes her to get sick three to four times a week. Plaintiff stated that she takes Lantus, Humulin, and Metformin for her diabetes. Additionally, Plaintiff stated that she has diabetic neuropathy which makes it difficult to use her hands for various self-care tasks and cooking. Plaintiff also testified that she could open doorknobs, pick up a penny, button buttons, and write. Plaintiff stated that she had been diagnosed with anxiety and depression. Plaintiff explained that she hears voices, stays depressed, does not want to be around anybody, lacks motivation, and has trouble concentrating. Plaintiff testified that she was on medication for anxiety and depression, but it worsened her depression.

A vocational expert witness, Dr. Russell B. Bowden, testified at Plaintiff's hearing. Dr. Bowden categorized Plaintiff's past work as a home health care provider, DOT 354.377-014 medium, SVP 3. The ALJ presented Dr. Bowden with a hypothetical individual of Plaintiff's age, education, and work experience, with the following modifications: "the individual is limited to light work, can only occasionally climb ramps, stairs, ladders, ropes, and scaffolds, stoop, kneel, crouch, crawl; can frequently balance, should avoid hazards such as dangerous moving machinery

or unprotected heights; can understand, remember and carry out detailed, but not complex tasks; can have occasional interactions with the general public and no limitations with co-workers or supervisors; can adapt to changes and respond to customary work pressures in a routine environment."[2] Dr. Bowden testified that the hypothetical individual could not perform Plaintiff's past relevant work. Dr. Bowden then testified that the hypothetical individual could perform the following jobs: (1) laundry inspector, DOT 361.687-014, light, SVP 2, with 12,000 jobs in the national economy; (2) belt inspector, DOT 683.3487-186, light, SVP 2, with 42,000 jobs in the economy; (3) packer, DOT 529.687-186, light, SVP 2, with 800,000 jobs in the national economy.

The ALJ then refined the hypothetical individual to have all the same limitations and added the individual cannot read fine print. Dr. Bowden stated that this new limitation would not affect the jobs he had recommended for the hypothetical individual. The ALJ, again, modified the hypothetical individual to have all the same limitations except, now, the individual could only perform work requiring occasional near acuity. Dr. Bowden testified that with those limitations inspection jobs were not appropriate, and that gross manipulation jobs would be best for the hypothetical person. Dr. Bowden testified that the individual could perform the following jobs: (1) wire sorter, DOT 728.684-022, light, SVP 2, with 65,000 jobs in the national economy; (2) laundry folder and a commercial laundry, DOT 369.687-018, light, SVP 2, 120,000 jobs in the national economy. The ALJ made a final modification to the hypothetical individual and limited the individual to sedentary work. Dr. Bowden testified that an individual who previously worked as a home health provider, would not have any transferrable skills to preform sedentary level work.

---

[2] Administrative Record, Oral Hearing Transcript *29–30 (Bates stamp p. 691–92).

*Medical Record*

The record reflects that Plaintiff has a history of uncontrolled type 2 diabetes mellitus, diabetic neuropathy with neurologic complications, benign essential hypertension, unspecified hyperlipidemia, allergic rhinitis, anxiety, other urinary incontinence, depression, and helicobacter pylori infection.

On June 6, 2012, Plaintiff presented at Christus Trinity Mother Francis ("CTMF") Hospital for a burn she received on her left foot. Dr. Earnest Stroupe treated Plaintiff's wound and discharged her the same day. Plaintiff saw Dr. Marina Flaskas at the CTMF Cardiac Observation Unit on November 19, 2012, complaining of squeezing of the chest, shortness of breath, and pain in her left shoulder and arm. Dr. Flaskas ordered labs and an EKG, which showed negative cardiac enzymes, non-specific T-wave abnormalities, and elevated glucose and LDL. Dr. Flaskas also ordered a Lexiscan and noted that Plaintiff tolerated it well. Dr. Flaskas discharged Plaintiff the next day with prescriptions for Losartan, Coreg, Lasix, Omeprazole, Meloxicam, Lantus, Humulin R, Allegra, and Simvasitin. Dr. Flaskas instructed Plaintiff to follow up with cardiologist, Dr. Idelchik in two weeks.

On December 20, 2012, Plaintiff saw her primary care physician, Dr. Kimberly Wegner, complaining of stomach pain, leg pain, back pain, headaches, and blurry vision. Dr. Wegner diagnosed Plaintiff with hypochromic-microcytic anemia and osteoarthritis. Dr. Wegner noted that it was questionable if Plaintiff took her insulin regularly, gave Plaintiff samples of Actos, Cymbalta, and Benicar, and instructed Plaintiff to stop taking Cozaar. On April 2, 2013, Plaintiff arrived at the CTMF Emergency Care Clinic complaining of chest pain, fatigue, and shortness of breath. Dr. Julie Williams ordered a chest X-ray, EKG, and CT scan, all of which were normal. Dr. Williams diagnosed Plaintiff with acute chest pain, high blood pressure, and acid reflux

disease, but opined that the symptoms were not cardiac related. Dr. Williams instructed Plaintiff to follow up with Gastroenterology and discharged Plaintiff the same day with prescriptions for Bentyl and Protonix. On June 11, 2013, Plaintiff returned to the CTMF Emergency Care Clinic and presented with a foreign body in her throat. Dr. Kai Xia ordered an X-ray of Plaintiff's abdomen which revealed a calcified granuloma in her left lower lung. Dr. Xia performed an upper GI endoscopy which revealed Plaintiff had dysphasia, dysphagia, and a food bolus stuck in her esophagus. Dr. Xia removed the specimen, sent it to pathology, and discharged Plaintiff the same day with instructions to take Prilosec.

On June 25, 2013, Plaintiff had a follow up visit with Dr. Wegner, complaining of neck pain, headache, sleep disturbances, depression, and pain from a cut in her left foot. Plaintiff stated that she repeatedly took Advil and had to lay down all day for her headaches and neck pain. Dr. Wegner diagnosed Plaintiff with arthralgia, anemia, hyperlipidemia, night muscle spasms, edema, pain, and depression. Dr. Wegner gave Plaintiff a prescription for Zoloft for her depression. On January 16, 2014, Plaintiff returned to see Dr. Wegner for shortness of breath, sinus pressure, headaches, sore throat, chest congestion, nasal drainage, and chills. Dr Wegner ordered an X-ray of Plaintiff's chest which showed no abnormalities. Dr. Wegner diagnosed Plaintiff with sinusitis and prescribed her Augmentin. On June 16, 2014, Plaintiff had a follow up visit with Dr. Wegner for her diabetes. Plaintiff presented with visual disturbances, nausea after eating, abdominal distension, myalgias, back pain and arthralgias. Dr. Wegner prescribed Plaintiff Ultram for pain, referred her to Ophthalmology, and ordered an ultrasound, which revealed no abnormalities.

On June 27, 2014, Plaintiff returned to the CTMF Emergency Care Clinic complaining of fatigue, weakness, leg pain, back pain, and chest pain. Plaintiff stated that the pain worsened with movement and was only relieved by sitting down. Dr. Robert Lueken ordered an EKG and a chest

X-ray, both of which were normal. Dr. Lueken diagnosed Plaintiff with myalgia, dyspepsia, and nausea, and discharged her the same day with a prescription for Zantac. A few days later, Plaintiff presented at the CTMF Ross Breast Center complaining of breast pain. Dr. John Larrinaga ordered a mammogram which showed scattered fibrograndular densities and a nodule on Plaintiff's left breast. Dr. Larrinaga then ordered an ultrasound, which revealed normal-appearing fatty echogenicity tissue. Dr. Larrinaga diagnosed Plaintiff with benign nodular adiposity and recommended she have a mammogram in one year.

On July 8, 2014, Plaintiff saw Dr. Xia at the CTMF Hospital Tyler Endoscopy Center complaining of GERD, abdominal bloating, gas, and change in bowel habits. An endoscopy revealed esophagitis, benign appearing esophageal stricture, gastritis, and duodenitis. During the endoscopy, Dr. Xia biopsied several areas and diagnosed Plaintiff with candidal esophagitis, structure and stenosis of esophagus, gastritis and gastroduodenitis, duodenitis, dyspepsia, and dysphagia Dr. Xia also performed a colonoscopy which showed diverticulitis, four polyps, which were resected and retrieved, and non–bleeding internal hemorrhoids. Dr. Xia diagnosed Plaintiff with benign neoplasm of the colon, hemorrhoids, constipation, and diverticulosis. Dr. Xia instructed Plaintiff to follow a high-fiber diet and to use Protonix. On September 17, 2014, Plaintiff returned, complaining of constipation and abdominal bloating. Dr. Xia preformed a colonoscopy which showed fragments of hyperplastic polyps, confirmed Plaintiff's diagnoses for diverticulitis and hemorrhoids, and resected and retrieved three more polyps.

On September 27, 2014, Plaintiff presented at CTMF Emergency Care Clinic, complaining of diffuse pain that started after three polyps were removed. Dr. Earnest Stroupe ordered an X-ray of Plaintiff's chest which showed no significant interval change, and an X-ray of Plaintiff's

12

abdomen which was unremarkable. An EKG also showed no abnormalities. Dr. Stroupe diagnosed Plaintiff with nausea and prescribed her Ondansetron.

On February 9, 2015, Plaintiff saw Dr. Wegner for chest pain, dizziness, pain in the eyes, and shortness of breath. Plaintiff stated that "I don't feel right" and would go through periods where she did not answer any questions.[3] Dr. Wegner called an ambulance to take Plaintiff to the CTMF Emergency Care Clinic, where Dr. Williams ordered a chest X-ray, EKG, Lexiscan, ECHO/TTT/TEE scan, stress test, ECG, and a CT. The EKG showed sinus rhythm and non-specific T-wave abnormality. The ECG showed sinus tachycardia, possible left atrial enlargement, low QRS voltage in precordial leads, and possible anterior myocardial infraction. All other tests were normal. Dr. Williams diagnosed Plaintiff with acute chest pain and discharged her the same day with a prescription for Tramadol and instructions to follow up with Dr. Sanford in Cardiology.

On February 17, 2015, Plaintiff had a follow up visit with Dr. Wegner and presented with neck pain. Plaintiff's X-ray showed normal vertebral alignment and narrowing disc space with endplate spurring at C5-6 and C6-7. Dr. Wegner diagnosed Plaintiff with moderate spondylosis at C5-6 and C6-7. On February 26, 2015, Plaintiff returned to see Dr. Wegner complaining of neck and arm pain. Plaintiff stated that her hands were numb, and that Aleve and Tramadol did not provide relief. Dr. Wegner reviewed Plaintiff's labs and noted that Plaintiff's hemoglobin and hematocrit were in the normal range and noted mild hypochomasia and microcytosis of the red blood cells. Dr. Wegner diagnosed Plaintiff with radicular pain and anemia, gave her prescriptions for Norco, Robaxin, and Xanax, and instructed Plaintiff to get an MRI. On April 27, 2015, Plaintiff saw Dr. Wegner for a follow-up, and had an X-ray of her chest, which showed that the appearance of Plaintiff's chest was unchanged, her cardiac silhouette was slightly prominent due to pericardial

---

[3] Administrative Record, ECF 2F, at * 62 (Bates stamp p. 1336).

fat, and that her lungs were clear. Dr. Wegner also ordered an X-ray of Plaintiff's spine which confirmed Dr. Wegner's previous diagnoses of moderate spondylosis at C5-6 and C6-7. Approximately one year later, on February 5, 2016, Plaintiff saw Dr. Wegner complaining of back, flank, foot, breast, and abdominal pain. Plaintiff stated that she had not taken Benicar as prescribed for several months but had taken some Metformin, even though she no longer had a prescription for it. Dr. Wegner diagnosed Plaintiff with generalized abdominal pain, dysuria, left foot pain, and breast pain.

On February 19, 2016, Plaintiff visited CTMF Emergency Care Clinic for fever, chills, congestion with cough, sinus pressure, diarrhea, and a left earache. Dr. Holley Everett diagnosed Plaintiff with acute frontal sinusitis and prescribed Tessalon, Keflex, and Diflucan. Dr. Everett discharged Plaintiff the same day. Plaintiff had a follow up visit with Dr. Wegner on March 18, 2016, complaining of back pain and headaches. Plaintiff stated that her pain was at a 10/10, that she tried NSAIDs without relief, and that she had not been taking her blood pressure medicine. Dr. Wegner noted that Plaintiff was unable to touch her toes and that her range of motion was limited. Dr. Wegner also noted that Plaintiff's mood was exaggerated considering Plaintiff's description of her pain. Dr. Wegner diagnosed Plaintiff with chronic back pain and headaches and gave her a prescription for Tramadol and exercises to preform for her back pain.

On June 3, 2016, Plaintiff presented at the CTMF Emergency Care Clinic with shortness of breath. Dr. Mark Anderson ordered an EKG which showed a possible anterior myocardial infraction. Dr. Anderson also ordered a chest X-ray, but Plaintiff left without getting it.[4] On December 12, 2016, Plaintiff had a follow up visit with Dr. Wegner for generalized body pain and stabbing pain in her toes. Dr. Wegner ordered a stool sample which revealed the presence of

---

[4] The Record shows that Plaintiff also went the CTMF Emergency Care Clinic for chest pain on August 20, 2017 and left without being seen.

helicobacter pylori ab+. Dr. Wegner noted Plaintiff was noncompliant with her helicobacter ab+ treatment and her hypertension medications. Dr. Wegner diagnosed Plaintiff with edema and neck pain, prescribed Lasix and Statin, and instructed Plaintiff to take Advil and Tramadol for pain. On March 31, 2017, Plaintiff was admitted to the Louis and Peaches Owens Heart Hospital for chest pain, shortness of breath, and fatigue. The doctor on call ordered a cardiovascular catheterization, an EKG, left heart catheterization, ultrasound of her abdomen, and an X-ray. Plaintiff's EKG showed sinus bradycardia with first degree AV block, low QRS voltage in precordial leads, and nonspecific T-wave abnormality. All other tests were normal, and Plaintiff was discharged the next day. On April 6, 2017, Plaintiff followed-up with Dr. Wegner complaining of back pain and swelling of the left foot. A physical examination also revealed hip tenderness. Plaintiff stated that she used Aleve from time to time to help ease the pain. Dr. Wegner gave Plaintiff referrals to an orthopedic surgeon for hip arthralgia and to physical therapy for her back and hip pain. Dr. Wegner gave Plaintiff a trial of Tramadol for pain and Reglan for nausea and increased her dosage of Benicar.

On April 13, 2017, Plaintiff had an initial consultation with Jacob Chaney, PA-C, at the CTMF Health Park Plaza Orthopedics and Sports Medicine Clinic for hip pain. Plaintiff stated that her pain was at a 10/10 and that she had tried to exercise, but it made her symptoms worse PA-C Chaney ordered an X-ray which showed minimal arthritic findings, diagnosed Plaintiff with pain in both hips, and gave Plaintiff bi-lateral hip injections of Depo–Medrol. On April 18, 2017, Plaintiff presented to CTMF Physical Medicine and Rehab for an initial consultation with a physical therapist, Suzanne Melhart, for her hip pain. PT Melhart ordered an X-ray which showed no abnormalities and diagnosed Plaintiff with bilateral lower back pain with sciatica, pain of both hip joints, weakness of trunk musculature, weakness of both lower extremities, decreased

functional mobility and endurance. PT Melhart referred Plaintiff to aquatic physical therapy three times a week for four weeks. Later that month, Plaintiff had an initial session of aquatic physical therapy but failed to return for any additional sessions.

On April 19, 2017, Plaintiff returned to Dr. Xia for another upper GI endoscopy and colonoscopy. During the endoscopy, Dr. Xia biopsied Plaintiff's stomach, the results of which showed helicobacter-associated chronic active gastritis, numerous helicobacter organisms identified by imunosatin. During the colonoscopy, Dr. Xia resected and retrieved one polyp and treated two non-bleeding colonic agioctasias with bipolar cautery. A biopsy of Plaintiff's colon showed polypoid colonic mucosa with intramucosal lymphoid aggregate. Dr. Xia diagnosed Plaintiff with dyskinesia of the esophagus, gastritis, anemia, and dysphagia. with hemorrhoids, benign neoplasm of transverse colon, angiodysplasia, and diverticulitis, and instructed Plaintiff to follow a high fiber diet. Four months later, Plaintiff had a follow up upper GI endoscopy and stomach biopsy and Dr. Xia diagnosed Plaintiff with a gastric ulcer, epigastric pain, and dysphagia, and instructed Plaintiff to follow an anti–reflux regimen and to avoid the use of NSAIDs.

On April 20, 2017, Plaintiff presented to CTMF Douglas Clinic complaining of headaches after a motor vehicle accident. Plaintiff stated that after the accident, she went to urgent care, was given Flexeril and Tramadol, and had an X-ray taken. Plaintiff stated that the urgent care physician had diagnosed her with arthritis. Dr. Laura Whitfield diagnosed Plaintiff with cervical muscle strains and prescribed Plaintiff Meloxicam for pain and Tizadine for spasms. On May 18, 2017, Plaintiff returned for a follow up with Dr. Larrinaga, complaining of breast pain. Plaintiff's mammogram showed scattered fibro glandular densities, without out change since the prior mammogram on July 1, 2014, and a DXA bone density scan revealed normal bone mineral density.

On July 7, 2017, Plaintiff saw Dr. Wegner for back pain. Plaintiff stated that Tramadol and Tizanidine did nothing for her pain, that she took Reglan sparingly, and that she completed all the physical therapy she could afford. Plaintiff additionally stated that aquatic physical therapy made her uncomfortable. Dr. Wegner noted that Plaintiff walked with an analytic gait, moaned a lot, and had diffuse tenderness in her hips. Dr. Wegner prescribed Crestor and instructed Plaintiff to stop taking Advil and to take Baby Aspirin instead. On August 18, 2017, Dr. Wegner ordered an MRI of Plaintiff's spine which showed a small disc protrusion at L4-5 and L5-S1 and facet degenerative change at L4-5. Dr. Wegner noted that these protrusions had not changed much since the last MRI on September 30, 2011. Plaintiff saw Dr. Wegner on November 28, 2017, for a follow-up visit. Plaintiff stated that she had continued to use NSAIDs despite being told to stop, and had completed one round of aquatic physical therapy, but chose not to return, stating that it only provided minimal help. Dr. Wegner diagnosed Plaintiff with chronic lower back pain with bilateral sciatica, chronic neck pain, iron deficiency, and anemia. Dr. Wegner also gave Plaintiff a referral to Endocrinology for her diabetes. On February 27, 2018, Plaintiff returned to Dr. Wegner complaining of back and left thumb pain but left without being seen, and on June 4, 2018, Plaintiff had a follow up appointment with Dr. Wegner for abdominal pain, breast pain, and tarry stools. Dr. Wegner diagnosed Plaintiff with renal insufficiency, prescribed Plaintiff Coreg CR for hypertension, and instructed Plaintiff to get a mammogram and ultrasound of her breasts.

The record reflects that from December 2017 to October 2020, Plaintiff saw Dr. Ming Lu at the Christus Health Ophthalmology Clinic to address Plaintiff's proliferative diabetic retinopathy of both eyes and macular edema with type 2 diabetes mellitus. Plaintiff's treatment included a monthly intravitreal injection of Avastin into both eyes, and Dr. Lu regularly performed Main and Base ophthalmology exams and took either a FUNDUS photograph or a Retina OCT

scan. On several occasions, Dr. Lu also preformed laser photocoagulation procedures on Plaintiff's eyes. At one appointment, Plaintiff stated that after receiving the previous injection, she experienced pain and had to lay down all day. At another appointment, Plaintiff stated that she felt pressure in her eyes, and, on two additional occasions, Plaintiff complained of white spots and floaters in her eyes.

On June 22, 2018, a state agency consultant, Dr. Dennis R. Combs, performed a psychological assessment. Dr. Combs diagnosed Plaintiff with major depressive disorder, generalized anxiety disorder, and moderate occupational impairment. Dr. Combs described Plaintiff's functional capacity as follows:

> Plaintiff can understand, remember, and apply information. Plaintiff can learn, recall, and use information to perform work activities. Plaintiff can carry out a task with one-two step oral instructions. Plaintiff is moderately limited in her ability to relate to and work with supervisors, co-workers, and the public. Plaintiff can concentrate, persist, and maintain pace with the ability to focus attention on work activities and stay on task at a sustained rate. Plaintiff can adapt and manage oneself but has a moderate impairment due to anxiety and depression.

Administrative Record, ECF 5F at *2–3 (Bates stamp p. 1396–97). That same day, another state agency consultant, Dr. Frank Rueter, saw Plaintiff and preformed a physical disability examination. Dr. Rueter noted Plaintiff's main complaint was chronic pain in her back and knees. Dr. Rueter determined that Plaintiff's visual acuity without glasses is 20/200 in the right eye and 20/100 in the left eye. With correction, Plaintiff's visual acuity was 20/70 in her right eye and 20/50 in her left eye. Additionally, Dr. Rueter noted that Plaintiff had a slow, painful gait and showed symptoms of osteoarthritis, mostly in her right knee. Dr. Rueter ordered an X-ray of Plaintiff's back and knee which showed mild endplate spurring at a few levels, degenerative facet disease, SI joints intact with mild degenerative changes and Phlebolith at the right lower pelvis.

Dr. Rueter diagnosed Plaintiff with degenerative disc degeneration and stated that Plaintiff's knee scan revealed no abnormalities.

On July 9, 2018, a state agency consultant, Dr. Norvin Curtis, saw Plaintiff and performed a mental RFC assessment Dr. Curtis opined that Plaintiff had "sustained concentration and persistence limitations, including a moderately limited ability to maintain attention and concentration for extended periods, a moderately limited ability to carry out detailed instructions, and a moderately limited ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances."[5] Additionally, Dr. Curtis determined that Plaintiff had a "moderately limited ability to complete a normal workday and workweek without interruptions from psychologically–based symptoms and had a moderately limited ability to perform at a consistent pace without an unreasonable number and length of rest periods."[6] Dr. Curtis found that Plaintiff had social interaction limitations with a "moderately limited ability to interact with the general public and a moderately limited ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes."[7] Dr. Curtis determined Plaintiff had adaption limitations with a "moderately limited ability to respond appropriately to changes in the work setting." [8]

That same day, another state agency medical consultant, Dr. Michal Douglas, completed an additional physical RFC assessment. After reviewing the medical evidence in the record, Dr. Douglas opined that Plaintiff retained the physical RFC to occasionally lift and/or carry 20 pounds, could frequently lift and/or carry 10 pounds, could stand and/or walk for 6 hours in an 8-hour workday, and had unlimited ability to push or pull. Additionally, Dr. Douglas determined that

---

[5] Administrative Record, ECF 3A at *10 (Bates stamp p. 709).
[6] *Id.* at * 10–11.
[7] *Id.* at *11.
[8] *Id.*

Plaintiff could occasionally climb ramps/stairs, could occasionally stoop, crouch, and crawl, and could frequently balance. Dr. Douglas found that Plaintiff had no manipulative, visual, communicative, or environmental limitations.

On August 28, 2018, Plaintiff had a follow up visit with Dr. Wegner, complaining of nerve pain in her feet, hands, and back, breast pain, and constipation. Plaintiff stated that she had not checked her blood sugar regularly because the test strips were too expensive. Dr. Wegner diagnosed Plaintiff with breast pain and abdominal bloating. Dr. Wegner prescribed Plaintiff Reglan for bloating, a trial of capsaicin for neuropathy, and instructed Plaintiff to make an appointment with Rheumatology for her pain. On September 13, 2018, Plaintiff presented to the CTMF Emergency Care Clinic, complaining of nausea and weakness. Dr. Laura Williams ordered an EKG which showed no abnormalities and diagnosed Plaintiff with generalized weakness. Plaintiff was discharged the next day with instructions to follow up with Dr. Wegner. On September 20, 2018, Plaintiff called Dr. Wegner and complained of back pain. Dr. Wegner gave Plaintiff a prescription for Amaryl after Plaintiff stated that she got off Actos because she ran out of samples.

On October 11, 2018, Plaintiff presented to the CTMF Gastroenterology Clinic, complaining of dysphagia, breakthrough acid reflux, epigastric abdominal pain, and chronic constipation. Dr. Bhavana Akotia diagnosed Plaintiff with oropharyngeal dysphagia, GERD, and slow transit constipation. Dr. Akotia recommended Plaintiff have an upper endoscopy with Dr. Xia and possible dilation for dysphagia. Plaintiff was advised to clean out with magnesium citrate, then start on MiraLAX and Colace. In addition, Plaintiff was instructed to take an anti-acid 30 minutes before dinner and to avoid citric juices, lemonade, oranges, tomato products, caffeine, chocolate, mints, carbonated drinks, and spicy food.

On October 12, 2018, Plaintiff arrived at the CTMF Emergency Care Clinic and was treated by Dr. Ricky Cameron. Plaintiff stated that her neck pain radiated into her left chest and caused her arms and legs to feel shaky. Dr. Cameron ordered an X-ray of Plaintiff's spine which showed degenerative changes with anterior marginal spurring at C5-C6 and C6-C7. Dr. Cameron also ordered an EKG which showed nonspecific T-wave abnormality. Dr. Cameron diagnosed Plaintiff with cervical radiculopathy and discharged her that same day with a prescription for Toradol and Robaxin. Plaintiff returned ten days later, complaining of back and chest pain. Dr. Preston Shumway ordered a CT scan of her chest, abdomen, and pelvis which revealed a thyroid nodule, hepatic steatosis of the liver, and colonic diverticula of the stomach and bowel. Dr. Shumway also ordered a chest X-ray which showed no abnormalities, and an EKG which showed nonspecific T-wave abnormality. Dr. Shumway diagnosed Plaintiff with acute exacerbation of chronic lower back pain and nonspecific chest pain. Dr. Shumway discharged Plaintiff the next day and instructed her to follow up with Dr. Wegner.

On December 23, 2018, a state agency physician, Dr. Brian Harper, performed a physical RFC assessment. After reviewing Plaintiff's medical record, Dr. Harper noted that Plaintiff retained the physical RFC to occasionally lift and/or carry 20 pounds, could frequently lift and/or carry 10 pounds, could stand and/or walk for 6 hours in an 8-hour workday, and had unlimited ability to push or pull. Additionally, Dr. Harper determined that Plaintiff could occasionally climb ramps/stairs, could occasionally stoop, crouch, and crawl, and could frequently balance. Dr. Harper found that Plaintiff had no manipulative, visual, communicative, or environmental limitations.[9] Dr. Curtis White, a state agency physician, performed a mental RFC assessment that same day. Dr. Curtis opined that Plaintiff had "sustained concentration and persistence limitations,

---

[9] Dr. Harper made the same determinations regarding Plaintiff's physical RFC as Dr. Douglas.

including a moderately limited ability to maintain attention and concentration for extended periods, a moderately limited ability to carry out detailed instructions, and a moderately limited ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances."[10] Additionally, Dr. Curtis determined that Plaintiff had a "moderately limited ability to complete a normal workday and workweek without interruptions from psychologically–based symptoms and had a moderately limited ability to perform at a consistent pace without an unreasonable number and length of rest periods."[11] Dr. Curtis found that Plaintiff had social interaction limitations with a "moderately limited ability to interact with the general public and a moderately limited ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes."[12] Dr. Curtis determined Plaintiff has adaption limitations with a "moderately limited ability to respond appropriately to changes in the work setting."[13]

On January 11, 2019, Plaintiff returned for a follow up appointment with Dr. Akotia and presented with abdominal distension and constipation. Plaintiff stated that she had used magnesium citrate to help clean out her bowels, but MiraLAX and stool softeners have not helped her. Dr. Akotia prescribed Linzess for Plaintiff to use after she cleaned out the next time. On January 14, 2019, Plaintiff had another follow-up visit with Dr. Wegner, and presented with complaints of joint problems in her hands and feet, stabbing pain in her feet, and chronic back and neck pain. Dr. Wegner diagnosed Plaintiff with a fatty liver, elevated ESR, and chronic renal insufficiency. Dr. Wegner instructed Plaintiff to contact Rheumatology and gave her a referral to Sleep Medicine and to CTMF Physical Medicine Rehab. Dr. Wegner also prescribed Reglan for gastroparesis and Savella for chronic pain.

---

[10] Administrative Record, ECF 6A at * 15 (Bates stamp p. 759).
[11] *Id.*
[12] *Id.* at *16
[13] *Id.*

On February 7, 2019, Plaintiff had an initial consultation with Dr. Martellotto at the CTMF Physical Medicine Rehab department and complained of back, neck, right arm, left arm, hip, buttocks, head, and knee pain. Dr. Martellotto ordered an MRI which showed disc protrusions at L4-5 and L5-S1 and a moderate degree of facet arthropathy at L4-5. A physical exam revealed Plaintiff exhibited tenderness to light palpations and percussions of the lumbar paraspinals at L4 and L5, iliolumbar ligament region, and sacroiliac joint. Dr. Martellotto additionally noted that Plaintiff had a positive straight leg raise, and that he was concerned that the degree of lumbar disc disease had progressed since her last MRI dated August 18, 2017. Dr. Martellotto diagnosed Plaintiff with lumbar facet arthropathy, lumbar spondylosis without myelopathy, a disorder of intervertebral disc of the lumbar spine, myalgia, sciatica of the left side, and muscle spasms.

On July 1, 2019, Plaintiff had a follow-up visit with Dr. Wegner, complaining of fatigue, constipation, nausea, abdominal pain, back pain, joint pain, muscle problems, depression, and sleep disturbances. Plaintiff stated that she took Advil from time to time to help her pain, stopped taking Reglan for gastroparesis, and did not regularly take Lantus as prescribed. Dr. Wegner diagnosed Plaintiff with fatigue and advised her to take vitamin B12 and Magnesium. Dr. Wegner prescribed Tramadol, gave Plaintiff a trial of Savella, instructed Plaintiff to take Benicar in the morning, changed her blood-pressure medicine to Norvasc, instructed her to take Coenzyme c10 with Crestor, and gave Plaintiff a second referral to Rheumatology. Plaintiff had an initial consultation with Endocrinologist Dr. Kyle Jackson on July 22, 2019. Dr. Jackson diagnosed Plaintiff with uncontrolled type-2 diabetes mellitus without complication, unspecified hyperlipidemia, obesity, and noncompliance with diabetes treatment. Plaintiff stated that she tried to take her blood sugar four times a day but brought in no data to support that. Dr. Jackson instructed Plaintiff to reduce Lantus, stop Humulin R, and to start Trulicity and Pravastatin.

Additionally, Dr. Jackson referred Plaintiff to Kim Young, a diabetic educationist and instructed Plaintiff to send in her blood sugar logs every month and to return for a follow–up in three months.

On September 4, 2018, Plaintiff saw Dr. Larrinaga complaining of breast pain. Dr. Larrinaga ordered a mammogram of both Plaintiff's breast, which revealed no changes since her prior mammogram on May 18, 2017. Dr. Larrinaga also ordered an ultrasound of Plaintiff's breasts which revealed normal fibrofatty tissue throughout the breast. Dr. Larrinaga noted that neither test showed any malignancy and recommended Plaintiff undergo a follow-up mammogram screening in one year. Approximately one year later, Plaintiff saw Dr. Gary Williamson at the CTMF Emergency Care Clinic for back pain. Plaintiff stated that Tramadol did not help her pain and that although Dr. Martellotto had previously ordered an MRI, she was unable to get it done because her insurance would not pay for it. Dr. Williamson diagnosed Plaintiff with acute exacerbation of chronic lower back pain and prescribed Naprosyn and Zanaflex.

On October 1, 2019, Plaintiff had a follow-up visit with Dr. Wegner. Plaintiff complained of weakness and fatigue, shortness of breath, indigestion, joint and muscle problems, back and neck pain, and depressed mood. Dr. Wegner noted that Plaintiff was non-compliant with gastroparesis treatment. Dr. Wegner gave Plaintiff referrals to Rheumatology for the third time and the Ross Breast Center for a mammogram. On October 29, 2019, Plaintiff had a follow-up appointment with Dr. Kyle Jackson at the CTMF MAP Endocrinology clinic. Plaintiff stated that she self-administered insulin in greater dosages than what she was prescribed and that she checked her blood sugar twice a day. However, Plaintiff failed to bring in her blood sugar logs as instructed. Dr. Jackson instructed Plaintiff to stop taking Lantus and to start Relion Novolin insulin, to continue Metformin, and to check her blood sugars twice a day. Dr. Jackson also changed Plaintiff's hypertension medicine to Lisinopril and told Plaintiff to send in weekly blood sugar

24

logs and to return in four months. On January 8, 2020, Plaintiff returned for a follow up with her gastroenterologist, Dr. Akotia, with complaints of dysphasia. Plaintiff stated that she did not pick up her Linzess as prescribed last visit. Dr. Akotia noted that Plaintiff had been incorrectly taking her dysphagia medicine, Omeprazole. Dr. Akotia recommended dilation to treat her dysphagia and instructed Plaintiff to clean out with magnesium citrate and to then start Linzess.

On January 17, 2020, Plaintiff visited CTMF Emergency Care Clinic after a fall from ground level. Plaintiff presented with pain in her right wrist, ankle, knee, and hip. Dr. Joseph Yard ordered an X-ray which showed no abnormalities, and diagnosed Plaintiff with right leg pain, right ankle sprain, and right wrist pain. Plaintiff was discharged the next day with a prescription of Ultram and was instructed to follow up with Dr. Wegner. On February 10, 2020, Plaintiff saw Dr. Xia for a biopsy of her colon. The biopsy showed colonic mucosa with lymphoid aggregates. On February 24, 2020, Plaintiff saw Dr. Wegner for headaches and back pain because of another fall, where she hit her head against a tire. During a physical examination, Dr. Wegner noted that Plaintiff could barely perform a straight leg raise test and moaned a lot during the examination. Dr. Wegner diagnosed Plaintiff with breast pain, iron deficiency, and chronic knee pain. Dr Wegner instructed Plaintiff to call Sleep Medicine to get a CPAP machine, to get a mammogram and ultrasound of her breasts, and to get an MRI of her spine which showed disc degeneration with mild disc protrusion at L5-S1 and facet arthrosis at L4-5. Dr. Wegner referred Plaintiff to an orthopedic surgeon for the third time and instructed her to get a straight walking cane.

On February 27, 2020, Plaintiff returned for a follow up appointment with Jacob Chaney, PA-C and presented with right knee pain. PA-C Chaney ordered an X-ray, which showed mild degenerative changes in the anterior compartment and diagnosed Plaintiff with unspecified,

chronic right knee pain, and gave Plaintiff an injection of Depo-Medrol into her right knee. PA-C Chaney instructed Plaintiff to take Motrin and to return in two weeks.

On March 9, 2020, Plaintiff returned for a follow up with Dr. Jackson. Dr. Jackson noted that Plaintiff self-administered the doses of insulin, was noncompliant with her treatment plan, and took Lantus even though she was no longer prescribed the medicine. Dr. Jackson recommended that Plaintiff follow up with a diabetic educationalist and send in her blood sugar logs weekly, even though she had been noncompliant with that instruction in the past. On March 19, 2020, Plaintiff saw Dr. Larrinaga complaining of breast Pain. Dr. Larrinaga ordered an ultrasound of her breast which showed benign fibrograndular tissue and a benign inflammatory lymph node. Dr. Larrinaga additionally ordered a mammogram of her breasts which showed scattered fibrograndular densities. Dr. Larrinaga noted that no malignancy was found and instructed Plaintiff to have routine mammogram screenings once a year for both breasts. On March 23, 2020, Plaintiff saw Dr. Dustin Stridger in Rheumatology. Plaintiff presented with fatigue, shortness of breath, diffuse pain all over her body, and hand numbness and tingling. Plaintiff stated that her pain was a 10/10, that she did not consistently wear her carpal tunnel splints, and that neither Advil, Tylenol, nor her injections helped her pain. Dr. Stridger diagnosed Plaintiff with fibromyalgia, instructed her to do low-impact exercises and prescribed her Lyrica and Cymbalta. Additionally, Dr. Stridger instructed Plaintiff to wear her carpal tunnel splints at night for one month.

On March 26, 2020, Plaintiff had a follow up visit with Dr. Martellotto at the Physical Medicine and Rehabilitation Center. Plaintiff presented with back and thoracic pain and stated that her pain was a 10/10 at its worst and, an 8/10 at its best. Plaintiff also stated that she had only taken a few of her pills of Cymbalta and Lyrica for her pain. Dr. Martellotto noted that Plaintiff had several tender points consistent with fibromyalgia and increased pain with lumbar facet loading

maneuvers, Plaintiff's FABER test was positive for pain, and that Plaintiff demonstrated tenderness in her back. Dr. Martellotto ordered an MRI of Plaintiff's spine which showed mild disc protrusion at L5-S1 and facet arthrosis at L4-5. Dr. Martellotto diagnosed Plaintiff with sacroiliac inflammation bilateral, lumbar facet arthropathy, lumbosacral spondylosis without myopathy, lumbar facet joint syndrome, a disorder of the intervertebral disc of the lumbar spine, fibromyalgia, status post lumbar spine fusion, chronic pain syndrome, chronic musculoskeletal pain, and trochanteric bursitis of both hips. Dr. Martellotto also discussed a plan to pursue fluoroscopic guided intervention. On April 7, 2020, Plaintiff arrived at the CTMF Gastroenterology Clinic complaining of dysphagia and stated that she could not wait to have an endoscopy done. Dr. Stephan Hutto performed an upper GI endoscopy and diagnosed Plaintiff with dysphagia after no abnormalities were found. On April 24, 2020, Plaintiff again saw Joseph Martellotto at the North Park Pain Procedure Center and received a Sacroiliac Joint Injection. Five months later, Plaintiff saw Dr. Jackson for another follow-up visit, and he instructed Plaintiff to take Lantus, Humulin R Insulin, and to send in her blood sugar logs, noting that Plaintiff had not yet done so.

## ANALYSIS

In her brief, Plaintiff identifies three issues for review: (1) whether the ALJ performed a proper analysis of the limiting effects of the medical treatment Plaintiff receives for her eyes; (2) whether the ALJ erred in assessing Plaintiff's chronic pain syndrome associated with her fibromyalgia, diabetic neuropathy with neurologic complications, and chronic back and knee pain; and (3) whether the ALJ erred in the RFC assessment by not including additional functional limitations regarding Plaintiff's use of her hands and by presenting an incomplete hypothetical.[14]

---

[14] Pl.'s Brief, ECF 21.

In his written decision, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since her alleged disability onset date of October 9, 2015.[15] The ALJ then concluded that Plaintiff has the severe impairments of type-two diabetes mellitus with neuropathy and retinopathy, degenerative disc disease, fibromyalgia, obesity, major depressive disorder, and generalized anxiety disorder. Ultimately, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Next, the ALJ concluded that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) during the relevant time period, except she was limited to occasionally stooping, kneeling, crouching, or crawling. Plaintiff was also precluded from climbing ramps, stairs, ladders, or unprotected heights and was limited to understanding, remembering, and carrying out detailed but not complex tasks.

Plaintiff first asserts that the ALJ failed to properly assess her treatment for her severe proliferative macular edema. Plaintiff claims that her monthly eye treatments cause her to miss two to four workdays and asserts the ALJ did not incorporate these limitations into his hypothetical. However, the ALJ's decision specifically noted that Plaintiff does not require any limitations due to vision. Plaintiff bears the burden to prove she fits into the category of disabled to qualify for disability benefits. *See Wren. v. Sullivan,* 925 F.2d 123,125 (5th Cir. 1991). To be disabled, the pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Falco* 27 F.3d at 163. Contrary to Plaintiff's assertion, the record evidence does not establish that Plaintiff's treatments require her to miss two to four workdays per month. Moreover, Plaintiff did not submit any testimony to that effect at the administrative hearing. The record shows that on separate occasions after receiving treatment, Plaintiff complained of pain, pressure in her

---

[15] Administrative Record, ECF 13 at * 3 (Bates stamp p. 18).

eye, white spots, and floaters, and at the hearing, Plaintiff testified that her eyes glow and go blurry without further elaboration. Thus, there is no evidence to suggest that Plaintiff would be required to miss two to four days per month to obtain her eye treatments, and Plaintiff's claim that the ALJ failed to properly consider her eye treatments lack merit.

Plaintiff also asserts that the ALJ incorrectly determined that she did not meet Listing 2.02, which requires that Plaintiff have "[r]emaining vision in her better eye after best correction of 20/200 or less." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 2.02. Regarding the 2.02 finding, the ALJ explained:

> The claimant's retinopathy associated with this does not meet the severity of section 2.02 because, with one exception, the claimant's visual acuity in each eye ranges from 20/30 to 20/70 with correction. (Ex. 4F/2; 10F/23, 63, 97, 159, 287, 397; 12F/3; 19F/7, 155). The claimant has 20/200 vision on the right, ostensibly with correction, in September 2019 (ex. 12F/25). Even if this was accurate, the claimant has not had 20/200 or less in the better eye

Administrative Record, ECF 14–2 at *6 (Bates stamp p. 21).

A determination as to whether a claimant meets or equals the requirement for a listing is reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Plaintiff likewise bears the burden of proof at this step of the sequential analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5. (1987). Plaintiff does not contest the finding that she has 20/30 to 20/70 visual acuity with correction. Instead, Plaintiff asserts that she meets the 2.02 Listing based on one eye exam in September 2019, which found that Plaintiff had 20/200 vision in her right eye with correction.[16] No other record evidence supports Plaintiff's conclusion. In his opinion, the ALJ noted that Plaintiff's assertion incorrectly evaluates her visual acuity, because the listing provides for visual acuity to be measured in the *better* eye with correction. The record reflects that *Plaintiff's right eye is not her better eye.*[17]

---

[16] *See* Administrative Record, ECF 12F, at * 25 (Bates stamp p. 1968).
[17] *Id.*

Thus, the ALJ properly explained his reasoning for finding that Plaintiff does not meet Listing 2.02 and the ALJ's decision is supported by substantial evidence.

In her second issue for review, Plaintiff alleges that the ALJ failed to properly assess her fibromyalgia. Plaintiff alleges that the ALJ erred in finding that her chronic pain syndrome in combination with fibromyalgia, diabetic neuropathy with neurological complications and chronic back and knee pain does not medically meet a Listing. Plaintiff asserts that the ALJ discredited her fibromyalgia when determining that she did not meet an Appendix I listing. Because fibromyalgia is not a listed impairment, Appendix I requires Plaintiff to have an impairment, in combination with fibromyalgia that medically equals a listing. (SSR 12-2p). Regarding an Appendix I finding, the ALJ explained:

> Fibromyalgia cannot meet a listing in appendix 1 because it is not a listed impairment. At step 3, therefore the undersigned must determine whether fibromyalgia medically equals a listing alone or in combination with another medically determinable impairment (SSR 12-2p). Because a finding that an impairment medically equals a listing requires the opinion to this effect rendered by a medical expert or a medical consultant designated by the commissioner, neither of which is present in this case, I cannot find that fibromyalgia medically equals a listing either alone or in combination with another medically determinable impairment.

Administrative Record, ECF 14-2 at *5-6 (Bates stamp p. 20-21).

Plaintiff still bears the burden of proof at this step of the sequential analysis. *Bowen*, 482 U.S. at 146. A determination as to whether a claimant meets or equals the requirement for a listing is reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Contrary to Plaintiff's argument, the ALJ acknowledged that Plaintiff had fibromyalgia and included fibromyalgia as one of Plaintiff's severe impairments. However, the ALJ did not find Plaintiff's allegations of constant pain persuasive because Plaintiff did not seek aggressive or frequent treatment for pain or comply with

prescribed therapies, and the medical records do not reflect signs of strength loss or muscle atrophy.

To determine if a claimant is disabled, the ALJ considers symptoms of her pain, the extent to which her symptoms can reasonably be accepted as consistent with the objective medical evidence, including statements of her pain, and descriptions from medical sources about how symptoms affect the claimant. 20 C.F.R. § 404.1529. A finding that a claimant's subjective complaints are exaggerated and not credible are precisely the kinds of determinations that the ALJ is best positioned to make. *Tripp v. Berryhill*, No. 4:17-CV-00811-Y-BP, 2018 WL 3559164 (N.D. Tex. June 22, 2018) (quoting *Falco*, 27 F.3d at 164).

In his opinion, the ALJ stated that it was "unlikely that [Plaintiff] had such extreme levels of pain and limitations with no waxing and waning for years on end."[18] While Plaintiff alleged that her pain was a 10/10, meaning that her pain could not get worse, the ALJ noted that on multiple occasions, Plaintiff's doctors witnessed extreme pain behaviors with relatively benign examination findings. Likewise, the record demonstrates that only Plaintiff sought conservative treatments including over-the-counter medicine and at-home exercises. The evidence further shows that Plaintiff refused to participate in aquatic aerobics, did not comply with her doctor's instructions for checking and logging her blood sugars, and reflects that Plaintiff was self-adjusting her medicine. For example, Plaintiff continued to take Metformin after Dr. Wegner instructed her to cease and Plaintiff self-administered higher doses of insulin than what was prescribed. Finally, the ALJ noted an absence in the record of evidence establishing loss of strength or muscle atrophy, which directly conflicts with Plaintiff's testimony that she spends most of the day lying in bed. Accordingly, after reviewing the record, there is substantial evidence to support the ALJ's finding

---

[18] Administrative Record, ECF 25.

regarding Plaintiff's pain, and Plaintiff's allegation that the ALJ erred in his assessment thereof, lacks merit.

Plaintiff also appears to allege that the ALJ erred by finding that Plaintiff did not establish a 1.04 Listing, which requires Plaintiff to show a spinal disorder that results in the compromise of a nerve root or the spinal cord. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.04. Regarding the 1.04 finding, the ALJ explained:

> The claimant does not meet the severity of listing 1.04 because the imaging did not show evidence of nerve root or cord compression. On the contrary, it showed deficits in the cervical spine described as moderate and deficits in the lumbar spine described as mild or small (Ex. 2F/98; 4F/3; 9F/15, 55; 19F/40; 22F5, 6). As for neurological deficits, the claimant exhibited positive straight leg raises on one occasion (Ex. 15F/10), a positive FABER test on another occasion (Ex. 22F/5), and only somewhat diminished reflexes on another occasion but exhibited no weakness (Ex 4F/2). Also, the claimant twice exhibited an antalgic gait and once exhibited a slow and painful gait (Ex. 4F/2; 15F/246; 22F/4). However, she otherwise has no deficits in gait, and she ambulated without an assistive device for almost the entire relevant period until February 2020, and even at this time, she was only prescribed a cane, not an assistive device requiring the use of both upper extremities (Ex. 15F/14). Therefore, she has not been unable to ambulate effectively as required by 1.00B2b.

Administrative Record, ECF 14-2 at *6 (Bates stamp p. 21). As stated above, Plaintiff still bears the burden of proof at this step of the sequential analysis. *Bowen,* 482 U.S. at 146. A determination as to whether a claimant meets or equals the requirement for a listing is reserved to the Commissioner. 20 C.F.R. § 404.1527(d).

Plaintiff's brief does not contest the ALJ's finding that no medical records show any signs of nerve compression. Instead, Plaintiff infers that a 1.04 Listing should be found and asserts that bilateral positive SLR diagnosis indicates nerve root compression. However, as the ALJ correctly noted, Plaintiff's position is inconsistent with multiple entries in the medical record, cited above, where the images of her spine showed no signs of nerve compression. Accordingly, the ALJ

considered the entire medical record and properly explained his reasoning for finding that Plaintiff did not meet Listing 1.04.

Plaintiff also challenges the ALJ's findings regarding Dr. Wegner's medical opinion statement.[19] Dr. Wegner opined that Plaintiff would require frequent breaks and the ability to sit and stand on her own. Though Dr. Wegner was Plaintiff's primary care physician and Plaintiff presented to her frequently, the ALJ found Dr. Wegner's opinion unpersuasive. The ALJ did not find Dr. Wegner's opinion persuasive because it was inadequately supported and inconsistent with the record. The applicable regulation, 20 C.F.R. § 404.1520(c) lays out five factors that the ALJ may consider when formulating an opinion about a treatment source. According to 20 C.F.R. § 404,1520c, the ALJ should focus on the persuasiveness of the medical opinion by considering: supportability, consistency, relationship with the claimant, specializations, and other factors.

In his opinion, the ALJ noted that Dr. Wegner only cited three treatment dates in 2020 and determined that the treatment did not support the limitations in the opinion. Specifically, the examinations cited by Dr. Wegner resulted in treatment plans that included medications, injections, at-home exercises, and fluoroscopic guided intervention. However, none of the treatment plans indicated the need for any functional limitations. Additionally, Plaintiff had no relevant objective deficits during physical examinations, except for tenderness in the knee on one occasion and one finding of a positive straight leg raise after a fall. Likewise, the ALJ determined that the findings from the examinations Dr. Wegner referenced were inconsistent with the functional limitations in Dr. Wegner's opinion because Plaintiff generally only endorsed back and neck pain, headaches, and one complaint of stabbing pain in her feet. Thus, the ALJ complied with the regulations and

---

[19] Plaintiff also asserts that the ALJ erred when he failed to properly consider Dr. Stidger's opinion. However, because Dr. Stidger is not an expert designated by the Commissioner, the ALJ is not required to consider his opinion.

properly found Dr. Wegner's opinion unpersuasive as it was not supported or consistent with the medical record.

In her third issue for review, Plaintiff asserts that the ALJ failed to properly assess her limitations with her hands and, as a result, presented an incomplete hypothetical. The ALJ's decision specified that Plaintiff could perform less than the full range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), and he identified additional limitations.[20] In his decision, the ALJ expressly evaluated the opinions of the state agency physicians, Dr. Douglas and Dr. Harper, who provided opinions concerning Plaintiff's ability to perform light exertional activities. During the hearing, Plaintiff stated that she could not open a jar, could not always turn a doorknob, and sometimes drops kitchen items, but also testified that she could pick up a penny, write with a pen or pencil, use utensils, and button buttons. Dr. Bowden testified that Plaintiff's previous job required her to do medium exertional work.[21] However, the ALJ ultimately concluded that Plaintiff could perform light exertional work, which involves lifting and carrying 20 pounds occasionally and 10 pounds frequently. Moreover, at the hypothetical, the ALJ reduced the amount of weight Plaintiff would be required to carry to light exertional work.[22] Accordingly, Plaintiff's allegation that the ALJ failed to consider her limitations with her hands and, as a result, presented an incomplete hypothetical when formulating the RFC lacks merit.

For the reasons above, the ALJ's findings are supported by substantial evidence and Plaintiff did not meet her burden of showing that she is disabled. *Ware v. Schweiker*, 651 F.2d 408,

---

[20] The regulation provides that light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." Light work includes "some pushing and pulling of arm or leg controls" 20 C.F.R. 404.15567(b).
[21] Administrative Record, Oral Hearing Transcript at *29 (Bates stamp p. 691).
[22] *Id.*

411 (5th Cir. 1981). The ALJ applied the correct legal standards. Accordingly, the Commissioner's decision should be affirmed, and the complaint should be dismissed.

So ORDERED and SIGNED this 23rd day of August, 2022.

_K. Nicole Mitchell_
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE